421 A.2d 299

James W. KELLY, an Incompetent by his Guardian, Southern Pennsylvania Bank, and Breezy Tavern, Inc., t/a Breezy Tavern

v.

Lorna E. RHODES and Elmer M. Rhodes and Betty Jane Rhodes,

and

Art Murphy of York, Inc.

No. 76 Appeal of Art Murphy of York, Inc.

No. 78 Appeal of Lorna E. Rhodes and Elmer M. Rhodes.

Superior Court of Pennsylvania.

Argued March 4, 1980.

Filed July 18, 1980.

Petition for Allowance of Appeal Denied Nov. 6, 1980.

Victor Dell'Alba, York, for Art Murphy, appellant in No. 76 and for appellee in No. 78.

John C. Herrold, York, for Rhodes, appellant in No. 78 and for appellee in No. 76.

Before CERCONE, President Judge, and WATKINS and MONTGOMERY, JJ.

MONTGOMERY, Judge:

This equity action was originally brought in 1977 by Southern Pennsylvania Bank, as guardian of James W. Kelly, an incompetent, and Breezy Tavern, Inc. (Breezy). Kelly died in 1979 and the case was thereafter prosecuted on behalf of his estate by his executor, Southern Pennsylvania Bank. It was originally brought against Elmer M. Rhodes and Lorna E. Rhodes, his present wife, and Betty Jane Rhodes, from whom he had been divorced. It sought to recover possession of premises on which the defendants were operating a licensed liquor establishment known as Breezy Tavern[1], an accounting for profits, etc. therefrom, and a decree that said defendants had no interest in Breezy Tavern, or in the real estate on which the tavern is situated. Art Murphy of York, Inc. (Murphy) was brought in as an additional party on the petition of plaintiff as the result of the pre–trial conference.[2]

1. James W. Kelly owned all 50 shares of stock of Breezy Tavern, Inc. except possibly 2 shares claimed by Elmer M. Rhodes, but no certificate was ever issued to him for those 2 shares.

2. The pre trial conference report reads "It appears to the court and counsel that since Elmer Rhodes asserts a continuing right to match the current offer (referring to the offer of $110,000.00 made by Art Murphy of York, Inc., which had been approved by the Orphan's Court), that the offeror should be brought into this litigation, to resolve this issue and to avoid a second suit." Statement within parenthesis supplied.

The issue presented on this appeal concerns the original written agreement dated July 11, 1962 whereby Breezy Tavern, Inc. agreed to pay to Elmer M. Rhodes and Betty Jane Rhodes as the registered managers of the corporation ninety per cent of the net proceeds from the operation of the tavern; which agreement also provided, inter alia:

"In the event that Breezy desires to sell the license and equipment as hereinbefore referred to, and in the event that Breezy should obtain a firm offer for the purchase of said license and equipment, Breezy doth hereby grant unto Rhodes the right of first refusal to purchase the license, inventory and equipment as hereinbefore referred to under the same terms and upon the same conditions as that contained in the firm offer of third party purchaser to Breezy, which right shall be exercised by Rhodes within a period of sixty (60) days of notification to Rhodes by Breezy."

By way of answer to the complaint filed by plaintiff, Lorna E. Rhodes and Elmer M. Rhodes set up an alleged written modification of the agreement of 1962, dated June 1, 1969 by which they contend that the selling price of the Breezy Tavern and property was set at $40,000.00. That alleged agreement was written on a scrap of paper by Lorna E. Rhodes and signed by Elmer M. Rhodes, James W. Kelly, Lorna E. Rhodes, Eugene Klinefelter and Clifford M. Kelley in that order and reads as follows:

"I, Elmer M. Rhodes, agree to give the children of James M. Kelly $40,000.00 upon his death for the Breezy Tavern and Property."

The lower court found that the words "and property" were written after the rest of the statement but stated that it was not clear from the testimony whether the words "and property" were inserted before or after the agreement was signed.

It also found that "By instrument, dated July 7, 1978, Art Murphy of York acquired the interest of Betty Jane Rhodes, now Betty Jane Sliver, in the agreement of July 11, 1962." However, the chancellor concluded that she had nothing to

assign since she had parted with whatever interest she had by her divorce settlement with Elmer M. Rhodes. Thus, whatever rights existed in the tavern and "the property" by reason of the aforesaid 1962 agreement were being held by Elmer M. Rhodes alone and that Art Murphy of York acquired nothing by this assignment of Mrs. Slivers.

The chancellor further concluded that the writing of June 1, 1969 gave Elmer M. Rhodes no legally enforceable rights in assets of Breezy Tavern, Inc. or the property of James W. Kelly; and that "The agreement of July 11, 1962, was modified by a course of conduct of the parties. Elmer M. Rhodes is not in breach thereof, but to the contrary continues to have a right of first refusal to purchase the assets of Breezy Tavern, Inc., and the real estate of James W. Kelly upon which the tavern is situated."

The decree nisi entered the 22nd day of September, 1978 provided as follows: —inter alia

"(1) Within sixty (60) days of the date this decree is final, Elmer M. Rhodes shall either: (a) match the offer of Art Murphy of York, Inc. by agreement dated January 6, 1978 by executing a written agreement identical thereto and thereafter fulfilling the terms thereof, or (b) Elmer M. Rhodes and Lorna E. Rhodes shall vacate the premises, thereby surrendering any interest in the assets of the corporation or the real estate upon which the tavern is situated."

Following the filing and disposition of exceptions, the decree nisi was modified "so that the right of first refusal which remains in Elmer M. Rhodes, relates to the assets of Breezy Tavern, Inc. only and not the real estate of James W. Kelly."

From that final decree, we have before us the appeal of Art Murphy of York, Inc. ( # 76) and the appeal of Lorna E. Rhodes and Elmer M. Rhodes ( # 78).

The appeal of Murphy states the issues raised thereby to be as follows:

"I.   Was the agreement, dated July 11, 1962, between the plaintiff and the defendant subsequently modified by the writing, dated June 1, 1969 so that the defendant acquired the right to purchase the corporate assets and real estate upon the death of the plaintiff for $40,000.00?"

"II.   Does the defendant have the right of first refusal to purchase the assets pursuant to the agreement of July 11, 1962?"

"III.   Does the defendant's right of first refusal under the terms of the agreement dated July 11, 1962, extend to the real estate owned by the plaintiff as well as the corporate assets expressly covered by the agreement?"

The Rhodes appeal (# 78) states but one issue, viz. "Did the written agreement dated June 1, 1969 modify the prior agreement of July 11, 1962 and create in Elmer M. Rhodes the right to purchase the corporate assets and real estate for $40,000.00 upon the death of James W. Kelly?"   All appellants acknowledge, however, that the 1962 agreement, as originally written, did not include the real estate of James W. Kelly.

Reviewing the issues as stated by all appellants, it appears the real issue is

(1) Did Elmer Rhodes have the right to purchase the assets of the Breezy Tavern owned by Breezy Tavern, Inc., and also the real estate on which the business of Breezy Tavern is conducted owned by the estate of James W. Kelly deceased, for $40,000.00 upon the death of Kelly by virtue of the writing signed June 1, 1969; and if he does not have that right,

(2) Does Elmer Rhodes have the right of first refusal to purchase the assets of Breezy Tavern under the agreement of July 11, 1962?

Our review of the record persuades us that the findings and conclusions of the chancellor, confirmed by the court en banc, as to the effect of the 1969 writing were correct.   To accomplish what Rhodes contends, viz. the right to purchase the corporate assets of Breezy Tavern, Inc. as

well as the real estate owned by James W. Kelly, individually, the paper is too informal and ambiguous. The 1962 agreement which Rhodes contends it modified, was formally executed by Kelly as President of Breezy Tavern, Inc. The 1969 paper contains no identification of Kelly either as President of the corporation, as a party to the alleged agreement or as a witness.

From the instrument, it cannot be determined whether he was accepting the offer of $40,000.00 payable after his death or is merely attesting the unilateral commitment being made by Rhodes as was the case of the other signatures following his signature. Since it was prepared by Mrs. Rhodes, acting for her husband, the ambiguity must be resolved against the party preparing it. *Hafer v. Schauer*, 429 Pa. 289, 239 A.2d 785 (1968), overruled on other grounds in *Incollingo v. Ewing*, 474 Pa. 527, 379 A.2d 79 (1977); *Commonwealth of Pennsylvania State Highway and Bridge Authority v. E. J. Albrecht Co.*, 48 Pa.Cmwlth. 491, 409 A.2d 1202 (1980). Viewing it in that light, it fails to identify the meaning of 'property', whether real estate or the personal property used in the tavern, or, whether it included the license for the sale of alcoholic beverages. Furthermore, it ignores the corporation's interest by providing for payment of the $40,000.00 directly to the Kelly children and not to the corporation.

On the other hand, if it was intended to provide for the sale of Mr. Kelly's stock in the corporation, as well as his real estate, it does not so state.

A contract for the sale of land must not only be in such form as properly expresses the intention of the parties, but must be definite and certain as to all essential terms. *Patrick and Wilkins Co. v. Adams*, 471 Pa. 63, 369 A.2d 1195 (1977). *King's Estate*, 183 Pa.Super. 190, 130 A.2d 245 (1957); *Schmidt v. Steinacker*, 165 Pa.Super. 69, 67 A.2d 664 (1949); *Stevens v. Doylestown Building and Loan Association*, 321 Pa. 173, 183 A. 922 (1936). Although this writing provides with certainty that Rhodes will pay $40,000.00 to the Kelly children at the time of their father's death, the

time of his death and the identity of his children at that time is most uncertain. Mr. Kelly died ten years after the paper was prepared and two years after the law suit was instituted. Also, the rights of the fiduciary in the Kelly real estate following his death is also ignored. *Quality Lumber and Millwork Co. v. Andrus et al.*, 201 Pa.Super. 189, 191 A.2d 685 (1963).

Further, uncertainty is found in determining the meaning of "property" as used in the 1969 paper. Whether that is intended to mean Mr. Kelly's stock in the corporation, the assets of the corporation or the real estate of Mr. Kelly is not clear. We recognize that the use of the word property may be sufficient in certain cases to identify the subject of an agreement of sale, *Portnoy v. Brown*, 430 Pa. 401, 243 A.2d 444 (1968), *O'Connell v. Cease*, 267 Pa. 288, 110 A. 266 (1920) but we agree with the chancellor that it is not sufficient in this case.

Applying the rule that ambiguities are to be resolved against the maker of an instrument, *Hafer v. Schauer*, (supra), the 1969 writing should at the most be considered only as an offer to buy the Breezy Tavern and other property, whatever that may be.

Our next consideration of the issue is whether Rhodes had any remaining right under the 1962 agreement to meet or refuse any offer its owner may have had for its sale. The answer to this question rests in a determination of whether the agreement was breached by Rhodes and his rights lost for that reason, or whether the terms of the agreement were modified by the subsequent conduct of the parties.

The agreement provided that Rhodes would manage the business on a year to year basis and that he was to receive 90% of the net proceeds of the operation as compensation. Expressly stated as within the contemplation of the parties as legitimate expenses in the calculation of net proceeds was inter alia—"The sum of one hundred ($100.00) per week, to be paid to James W. Kelly, individually, representing rent and payment on account of a certain judgment note in the amount of $10,000.00 in which the obligor is Breezy Tavern,

Inc.–" Rhodes ran the business thereafter and paid regularly the sum of $100.00 a week to Mr. Kelly to the time of the adjudication in this case. In addition, for the first five years, he paid to Mr. Kelly an additional $50.00 a week on account of the $10,000.00 note. On or about July 1, 1973, he moved into the apartment over the tavern, previously occupied by Mr. Kelly and thereafter paid an additional $100.00 per month under a lease agreement. However, he did not pay the additional 10% of the net proceeds as provided by the agreement. Kelly did not ever demand payment or ask for an accounting, although in 1974, his son, acting under a power of attorney from his father, did so but took no action to press the claim prior to the time his father was declared incompetent.

Although York contends that Rhodes breached the 1962 agreement by not accounting for and paying Kelly 10% of the net proceeds of the business and taxes on the real estate, the chancellor found, and we agree, that the contract was not breached but was modified by the subsequent action of the parties. As to the question of taxes, the parties interpreted the contract to exclude real estate taxes from the expenses of the business. Kelly paid them and never requested reimbursement from Rhodes. Thus, the meaning to be given "taxes" as expressed in the agreement would be taxes related to the business, and therefore, there was no breach by the failure to Rhodes to pay them.

As to 10% of the net proceeds which was never paid as such or demanded, Rhodes did pay to Kelly $50.00 a week over and above the $100.00 a month called for by the agreement. The agreement called for $100.00 a week was to be paid to Kelly individually "representing rent and payment an account of a certain judgment note in the amount of the above said ($10,000.00). This extra $50.00 a week was paid regularly over a period of four years, which in total, paid off the note. This clearly indicates the parties' resorted to this means of adjusting the 10% of the net profits which may have exceeded what the 10% would have amounted to. In addition, the record shows Rhodes altered the premises,

replaced and added equipment all with the knowledge of Kelly and without a demand for 10% of the net profits. Again, this indicates an acquiescence in these improvements and additions in lieu of 10% of the net profits and that Mr. Kelly, the beneficiary of the contract, was in agreement.

We agree with the chancellor's conclusion there was no breach by Rhodes of his contract with Breezy Tavern, Inc., and that his right to accept or refuse any offer of sale, shown by the 1962 agreement, was not terminated. However, we cannot agree that Rhodes must accept or reject the offer made by York of $110,000.00 which was for the assets of the Breezy Tavern as well as the real estate of James W. Kelly Estate. The right given to Rhodes under the 1962 agreement was "the right of first refusal to purchase the license, inventory and equipment of Breezy Tavern—under the same terms and upon the same conditions as that contained in the firm offer of a third party to Breezy." We do not interpret this provision to mean that one of those conditions would be the purchase of the Kelly real estate, in addition to the assets of the Tavern. The final decree of the lower court makes this clear and we agree. However, for the purpose of clarification, we believe the final decree should be amended as hereinafter set forth.

For the foregoing reasons, the final decree from which these appeals have been taken is amended to read:

1. Within thirty (30) days of the filing of this opinion, Art Murphy of York, Inc., is given the right to make a legitimate offer to purchase the license, inventory and equipment of Breezy Tavern; and within sixty (60) days from the day he receives notice of that offer, Elmer M. Rhodes shall either; (a) match the offer of Art Murphy of York, Inc. by a written agreement identical thereto and thereafter fulfill the terms thereof, or (b) Elmer M. Rhodes and Lorna E. Rhodes shall vacate the premises, thereby surrendering any interest in the assets of the corporation or the real estate upon which the tavern is situated.

2. Under either election, Elmer M. Rhodes and Lorna E. Rhodes, his wife, are hereby declared to have no interest in the real estate of James W. Kelly, deceased.

3. Should Art Murphy of York, Inc., refuse to make an offer for the license, inventory and equipment of Breezy Tavern, the 1962 agreement between it and Elmer M. Rhodes, as the present sole contracting party, shall renew in full force and effect until terminated by the terms thereof or otherwise.

4. Each party to the litigation shall pay its or his own costs.